2026 IL App (1st) 252229-U

FIFTH DIVISION
July 31, 2026

No. 1-25-2229

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| EDGAR RAFAEL NAVARRO-ANGULO, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 2025CH03343 |
| POLICE BOARD OF THE CITY OF CHICAGO, | ) | |
| CHICAGO POLICE DEPARTMENT, AND THE | ) | The Honorable |
| OFFICE OF PUBLIC SAFETY ADMINISTRATION, | ) | Patrick T. Stanton, |
| | ) | Judge Presiding. |
| Respondents-Appellees. | | |

JUSTICE WILSON delivered the judgment of the court.
Justices Mikva and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The Police Board properly disqualified the appellant from eligibility as a probationary police officer. The appellant failed to show that his removal from the eligibility list was erroneous, and the agency's procedures complied with due process.

¶ 2   Appellant Edgar Rafael Navarro-Angulo applied for a probationary police officer position with the Chicago Police Department (CPD). As part of the application process, Chicago's Office of Public Safety Administration (OPSA) conducted a background investigation. After the investigation, Navarro-Angulo was removed from CPD's employment eligibility list based on past

criminal conduct and dishonesty. Navarro-Angulo challenged his disqualification through an administrative appeal to the Police Board of the City of Chicago (Police Board), which upheld the decision. Navarro-Angulo then filed an action for administrative review in the Circuit Court of Cook County. The circuit court issued an order affirming the Police Board's judgment and Navarro-Angulo now appeals. We affirm the judgment of the Police Board and the circuit court for the following reasons.

¶ 3                                    I. BACKGROUND

¶ 4                        A. Probationary Police Officer Application Procedures

¶ 5      The application process to become a Chicago police officer is multilayered and involves various city agencies, including OPSA and CPD. *CPD Hiring Process*, JoinCPD, (last visited June 17, 2026), https://join.chicagopolice.org/process/ [https://perma.cc/X9QA-ZK8X]. Pre-employment hiring steps include an application, written exam, drug screen, background investigation, and other screening measures. Once applicants successfully complete all pre-employment hiring steps, they receive a formal offer of employment and report to the Chicago Police Academy for training. *Id*. After being admitted to the Police Academy, recruits are subject to an 18-month probationary period. *Frequently Asked Questions*, JoinCPD, (last visited June 17, 2026), https://join.chicagopolice.org/faq/ [https://perma.cc/P3BP-G4QU]. If an applicant fails any portion of the hiring process, including the background investigation, OPSA will stop processing the application and will remove the applicant's name from the eligibility list. *Id.*

¶ 6      Under CPD's hiring standards, applicants will be removed from the employment eligibility list if the background investigation uncovers certain types of dishonest or unlawful conduct, including: (i) the "failure to fully disclose all known information requested [during the background investigation], whether it is beneficial or prejudicial to the applicant," (ii) criminal conduct

2

"demonstrating a reputation or propensity for dishonesty," including "bribery" and "eavesdropping", and (iii) criminal conduct "demonstrating a propensity for violence," including "assault; battery, aggravated battery; *** domestic violence; [and] stalking." Disqualification is appropriate if there is any evidence that the applicant has engaged in criminal conduct, even if the applicant was never convicted of a criminal offense.

¶ 7                    B. Appellant's Application and Disqualification

¶ 8    In 2023, Navarro-Angulo applied to CPD for a probationary police officer position. During the application process, OPSA conducted a background investigation of Navarro-Angulo. As part of the investigation, OPSA collected documents, interviewed Navarro-Angulo and other individuals, and prepared a report dated May 8, 2024 (the Report). The Report, authored by investigator James Lynch, describes two main incidents: (1) Navarro-Angulo's alleged mistreatment of his ex-girlfriend, S.J., during college in 2012, and (2) his alleged battery of a woman, L.C.-T., in December 2023.

¶ 9    According to the Report, in October 2012 Navarro-Angulo allegedly stalked and assaulted his ex-girlfriend S.J. while they were attending Morton College together. Investigator Lynch relied on interviews with both Navarro-Angulo and S.J., and a domestic disturbance incident report filed by the Morton College Police Department on October 3, 2012. In the incident report, a Morton College police officer described encountering Navarro-Angulo and S.J. engaged in a verbal altercation. When the officer approached, Navarro-Angulo fled on foot. The officer then spoke with S.J., who stated that she had broken up with Navarro-Angulo about a month ago and that he was "controlling" and "could not get over" their breakup. S.J. further stated that Navarro-Angulo had been attempting to talk to her even though she did not wish to speak to him, and had grabbed her by the arm, at which point she began walking to the campus police department for help. The

reporting officer later located and spoke to Navarro-Angulo, who was uncooperative and yelled, "She is my f*** girlfriend! [A]nd is it against the law to speak with my girlfriend?!" Navarro-Angulo confirmed that he had grabbed S.J. by the arm while attempting to speak to her. The officer instructed Navarro-Angulo that "there is to be no contact" with S.J. S.J. returned to the police department approximately five days later and reported that Navarro-Angulo had made multiple attempts to contact her via telephone, despite the officer's instruction.

¶ 10   On January 11, 2024, an OPSA investigator interviewed S.J. by telephone. During the interview, S.J. stated that Navarro-Angulo did not understand that "no means no" and had engaged in stalking behavior towards her. S.J. further stated that Navarro-Angulo displayed "anger issues," and had once thrown a chair at her in the cafeteria at Morton College because he was upset that S.J. would not leave the cafeteria with him.

¶ 11   In October 2012, S.J. applied for an order of protection against Navarro-Angulo in the Circuit Court of Cook County. The petition for order of protection stated that Navarro-Angulo harassed S.J. via phone and text, continued to physically follow her around, and grabbed her at school when she tried to ignore him. The petition also states that Navarro-Angulo would punch and throw things when angered, and that S.J. was scared that he would harm her. The court granted the order of protection.

¶ 12   Investigator Lynch also reviewed a police report regarding an alleged incident involving a different woman, L.C.-T., on December 10, 2023. The report listed Navarro-Angulo's name, age, date of birth, and home address. In the report, a Chicago police officer stated that L.C.-T. approached the officer's squad car on the street and was bleeding from a gash on her upper lip. L.C.-T. told the officer that she had been in the apartment of Navarro-Angulo, who she described as her boyfriend, when he had physically attacked her. L.C.-T. reported that Navarro-Angulo had

punched her in the leg multiple times with a closed fist, told her "I'm going to f*** you up, but not in your face," and then struck her in the side of the head, in addition to damaging her cell phone. Navarro-Angulo then dragged L.C.-T. by the hair into a different room and hit her in the face with a water bottle, causing the cut on her lip. According to L.C.-T., Navarro-Angulo told her to "relax" and said "don't f*** me up, I am in the police academy," as well as threatened to "shoot up [her] house" if she went "to the police station." The reporting officer understood Navarro-Angulo to be a probationary police officer based on his statement. The reporting officer then checked with the Bureau of Internal Affairs regarding whether Navarro-Angulo was enrolled in the police academy, and learned no one with that name was currently at the academy.

¶ 13    On April 23, 2024, an OPSA investigator interviewed L.C.-T. by telephone. During the phone call, they discussed the police report regarding Navarro-Angulo's alleged battery of L.C.-T. Specifically, the investigator asked whether "there was anything that was untrue about the report." L.C.-T. replied that the report was accurate.

¶ 14    During a subsequent interview, an investigator asked Navarro-Angulo whether he knew a person named L.C.-T. and Navarro-Angulo twice denied knowing anyone by that name. After the investigator informed Navarro-Angulo that he was listed as an offender in a report regarding a battery of L.C.-T., Navarro-Angulo finally admitted that he knew L.C.-T., but stated that he had "only hung out with her a couple of times" and denied involvement in the battery.

¶ 15    In addition to the alleged incidents involving S.J. and L.C.-T., the Report also noted a relationship with a woman named R.M that Navarro-Angulo initially failed to disclose. According to the Report, Navarro-Angulo initially told an investigator that he had not had any romantic relationships after 2012. After further questioning, Navarro-Angulo then stated that he was in a relationship with a woman, R.M. from 2015 to 2016. Navarro-Angulo told the investigator that

R.M. had since moved out of state and he did not have her phone number or address. Due to the common name of R.M., the investigator was not able to verify any contact information for her.

¶ 16    On July 16, 2024, based on the findings of the background investigation, OPSA disqualified Navarro-Angulo from employment with CPD. The investigative summary provided three bases for the disqualification: (1) evidence of criminal conduct indicating violent tendencies, based on Navarro-Angulo's alleged stalking and assault of S.J. and assault, battery, and damage to the property of L.C.-T.; (2) evidence of criminal conduct indicating dishonesty, namely impersonation of a police officer, based on Navarro-Angulo's reported statement to L.C.-T. that he was enrolled in the police academy; and (3) false statements or omissions during the background investigation, based on Navarro-Angulo's failure to initially disclose his relationships with R.M. and L.C.-T.

¶ 17                      C. Appeal to the Police Board

¶ 18    On September 11, 2024, Navarro-Angulo filed a written appeal of the disqualification decision with the Police Board. He argued that the decision was "unjust" because he had "never been arrested" and "maintain[s] a clean record." Regarding his relationship with S.J., Navarro-Angulo explained that they were "high school sweetheart[s]," that S.J. had "[i]influenced" Navarro to attend Morton College, and that they had broken up shortly after the school year started, which left him "feeling betrayed." Navarro-Angulo stated that their relationship had been "childish and unproductive" and "marked by youthful immaturity and emotional volatility, which contributed to misunderstandings and conflicts." He argued that his conduct towards S.J. should not be deemed stalking because "[a]ny contact made was an attempt to resolve lingering issues from our past relationship, not to harass or intimidate." Regarding S.J.'s statement that Navarro-Angulo threw a chair at her, he stated that the "incident in question was an isolated event, not indicative of a pattern

of threatening behavior," and argued it should not be deemed assault because there was "no evidence that this action placed S.J. in reasonable apprehension of receiving a battery."

¶ 19 Navarro-Angulo also submitted S.J.'s October 2012 petition for an order of protection in support of his appeal. In the petition, S.J. stated that Navarro-Angulo "harasse[d] [her] through phone calls and text messages," would come to her home and "ring[] the doorbell and hid[e] in the side of the door," and "continue[d] to follow [her] around school." If S.J. ignored Navarro-Angulo, he had a "tendency to grab [her] by the arm." S.J. further stated that Navarro-Angulo would become angry and aggressive by "punching walls or throwing things," and had threatened to beat up S.J.'s friends. S.J. stated that she was "scared that one of these days [she] will be harmed by him." In his appeal, Navarro-Angulo emphasized this last statement, contending that it established that he "never hurt her in any way."

¶ 20 Regarding the incident with L.C.-T., Navarro-Angulo stated that she was a casual acquaintance whom he met "twice in [his] life" and only knew "by her nickname or Instagram username." He contended the police report regarding the battery of L.C.-T. contained "false accusations." Navarro-Angulo conceded that the report contained correct personal information about him, "including [his] name and address." He stated that, the first time he met L.C.-T., he had witnessed her "going through" his vehicle's glovebox, and speculated that she had learned his personal information from documents contained therein. He further argued that the police "report relie[d] solely on second-hand information from the victim, [L.C.-T.], whose credibility may be questionable due to potential motives to fabricate or exaggerate the incident."

¶ 21 Navarro-Angulo submitted a letter to the Police Board that is purportedly signed by L.C.-T. The letter states that she was "coerced by [her] ex-boyfriend," "whom [she is] unable to mention by name," into making "false accusations" against Navarro-Angulo. The letter further states that

L.C.-T. "never confirmed that the report was true, nor did [she] explicitly deny it," in a call with investigator Lynch.

¶ 22     In support of his appeal, Navarro-Angulo also submitted what he described as "an audio recording taken without consent" of a conversation between himself and L.C.-T. which "confirm[s] my innocence on the domestic incident" that occurred on December 10, 2023. The parties stipulated to the inclusion of two audio recordings Navarro-Angulo submitted to the Police Board. The audio recordings are part of the record of this appeal, and the Court has listened to the recordings. In one recording, a male voice, presumably Navarro-Angulo, states "I really want to be a cop" and "I need that letter," and asks, several times, "what did you tell" the investigator. After repeated questioning from Navarro-Angulo, a female voice, presumably L.C.-T., states that she did not deny the contents of the police report during the call with the investigator, but claims she just "didn't speak about that."

¶ 23     Finally, Navarro-Angulo also argued that he "did not intend to withhold any information or be misleading during the application process." Regarding the relationship with R.M. that he did not initially disclose, he stated that he thought it was "not significant enough for me to initially consider it" worth noting. Navarro-Angulo further claimed that he repeatedly denied knowing L.C.-T. because he only knew her by her nickname, "Brat."

¶ 24     On October 31, 2024, OPSA Human Resources Director Joy Brown submitted a written response to Navarro-Angulo's appeal. Brown explained that, notwithstanding Navarro-Angulo's arguments, each of the bases for disqualification were supported by evidence collected by the investigators. As for the audio recording of Navarro-Angulo's conversation with L.C.-T., Brown pointed out that it could be construed as intimidation of a domestic violence victim, and the fact that it was secretly recorded without L.C.-T.'s consent may itself have been an unlawful act. Brown

also submitted additional records for the Police Board's review. The additional records included reports indicating that Navarro-Angulo was arrested by CPD in 2012 for criminal trespass, and by the Brookfield Police Department in 2015 for driving under the influence of marijuana. These records are contrary to Navarro-Angulo's assertion that he had never been arrested.

¶ 25    Navarro-Angulo submitted a reply on November 30, 2024. Regarding S.J., Navarro-Angulo stated that he had been "furious" at her and that, because "she was dating a new guy not even a week after their breakup," he "wanted to get answers" by speaking with her. Navarro-Angulo stated that he had attempted to confront S.J. in the cafeteria at Morton College, but claimed he did not throw a chair, and instead shoved chairs aside when two of S.J.'s friends "prevented [him] from speaking to her." Navarro-Angulo further asserted that S.J. was "talked into putting *** an order of protection against [him]" by her family. Navarro-Angulo also suggested his behavior towards S.J. should be considered in light of his young age at the time because he "had just turned 18 years old."

¶ 26    In his reply he asserted, regarding L.C.-T.'s police report, that the report contained "false allegations." Navarro-Angulo stated that he was "heavily being attacked by the Human Resources Division Director Joy Brown," and posited that Brown "is just taking [L.C.-T.'s] side because she is a woman herself." Navarro-Angulo further stated in his reply, apparently in support of the contention that L.C.-T. had falsely accused him: "you know how many girls have claimed that someone raped them? Even get the guy sent to prison and then they retract their statement."

¶ 27    Regarding his recording of L.C.-T. without her consent, Navarro-Angulo stated that he was not "committing a crime willingly," and was instead "just trying to gather and have *** some evidence to counterattack these false allegations." Navarro-Angulo attached a second recording to his reply, which he characterized as capturing a discussion regarding a possible payment for L.C.-

T. to recant her report of battery. In the recording, a male voice, presumably Navarro-Angulo, states, "L*** that's all I have," to which a female voice, presumably L.C.-T., replies, "you're fine, you'll figure it out." Navarro-Angulo then says, "I'll give you one hundred dollars," and "you're blackmailing me."

¶ 28    Finally, in the reply, Navarro-Angulo conceded that his initial submission to the Police Board incorrectly stated that he had never been arrested. He argued that he was not required to disclose any arrests because his record had been expunged through a judicial order. In support, Navarro-Angulo cited the following portion of section 12(a) of the Criminal Identification Act (20 ILCS 2630/12(a) (West 2022)): expunged records "may not be considered by any private or public entity in employment matters, certification, licensing, revocation of certification or licensure, or registration."

¶ 29    Subsequently, appeals officer Laura Parry prepared a recommended decision and findings of fact for the Police Board. The appeals officer found that Navarro-Angulo did not sustain his burden to establish, by a preponderance of the evidence, that the decision to disqualify him was erroneous. The appeals officer found that CPD offered an adequate factual basis for the decision to disqualify, and that Navarro-Angulo's insistence that allegations were not shown by video or pictorial evidence, and that he was not arrested or convicted for the offenses, were not persuasive responses. The appeals officer further noted that Navarro-Angulo insisted that the victims may have been motivated to make false reports but never presented persuasive evidence of what those motivations were.

¶ 30    The appeals officer offered several reasons for not giving credit to Navarro-Angulo's versions of events. The appeals officer's findings of fact stated, that "[i]n a review of all the material presented in the Appeal, it appeared to the Appeals Officer that Applicant is either highly

manipulative or does not understand that his repeated actions and pressing for what he wants can be manipulating, intimidating and/or harassing." Further, the appeals officer cited the "phone call he illegally recorded with" L.C.-T. to be "just one such example" of his manipulating, intimidating, and harassing behavior. The appeals officer did not find Navarro-Angulo's statement that he only met L.C.-T. a couple of times to be credible. Instead, the appeals officer found that the "recording seemed to be between two people who were very familiar with each other – not between people who had only met a couple of times or had sporadic contact." The appeals officer concluded that the recording "bears poorly on his credibility."

¶ 31    Nor did the appeals find the letter from L.C.-T. to be credible. The appeals officer noted the letter from L.C.-T. may have been "given under coercion or by payment" based on Navarro-Angulo "offering $100 for the retraction" in the second recording.

¶ 32    The appeals officer's concerns about Navarro-Angulo's credibility were not limited to the alleged conduct against S.J. and L.C.-T. The appeals officer found that Navarro-Angulo's "demonstrated repetitive agitation towards the victims [and the] Department's Human Resources Division Director [Brown], all women, bear poorly on his credibility as it relates to his relationship to and with women." Moreover, the appeals officer found that Navarro-Angulo's "omission of part of [the] Illinois statute that excepts law enforcement agencies from the prohibition of considering records that are expunged in employment decisions" also reflected poorly on his credibility.

¶ 33    On February 20, 2025, the Police Board adopted the findings and recommended decision of the appeals officer by a unanimous vote of nine in favor to zero opposed, and thereby affirmed the disqualification decision.

¶ 34                              D. Circuit Court Proceedings

¶ 35    On March 24, 2025, Navarro-Angulo filed a complaint for administrative review in the

Circuit Court of Cook County. The complaint, as amended on June 2, 2025, claimed that (i) defendants violated due process because the Police Board ignored key mitigating evidence, CPD relied on unverified witness claims, and OPSA approved findings without proper review, and (ii) defendants abused their discretion because the Police Board based its decision on unsupported claims, CPD relied on subjective allegations, and OPSA failed to conduct an independent assessment.

¶ 36     On October 2, 2025, after the parties submitted briefs on the merits of the claims, the circuit court entered an order affirming the Police Board's decision. The court concluded that the decision was neither against the manifest weight of the evidence nor clearly erroneous. The court explained that evidence in the record showed that Navarro-Angulo "did engage in the disqualifying conduct," and his emphasis on the lack of charges or a conviction was irrelevant under the hiring rules. The court declined to re-weigh the evidence or disturb the Police Board's credibility determinations. Regarding the claimed violation of due process, the court concluded that defendants satisfied the essential requirements for due process by providing notice of the reasons for the disqualification and an opportunity to be heard through the submission of evidence and written arguments. Finally, the court noted that Navarro-Angulo had cited certain nonexistent cases and offered no explanation for doing so. As a result, the court struck and disregarded the nonexistent case citations.

¶ 37     On October 31, 2025, Navarro-Angulo filed a notice of appeal from the circuit court's order. We have jurisdiction over this appeal from the final judgment of the circuit court pursuant to Illinois Supreme Court Rule 303(a) (eff. July 1, 2027).

¶ 38                                 II. ANALYSIS

¶ 39                             A. Standard of Review

¶ 40     In administrative review appeal, we review the administrative agency's decision and not

the circuit court's decision. *Cintron v. Dart*, 2022 IL App (1st) 201369, ¶ 19. An administrative agency's findings of fact may be reversed only where they are "contrary to the manifest weight of the evidence." *Id.* "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006). Accordingly, the "mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." *Id.* We are not permitted to reweigh the evidence or substitute our judgment for the agency's judgment. *Cintron*, 2022 IL App (1st) 201369, ¶ 19. When there is sufficient evidence in the record to support an administrative agency's findings, we will not reverse the agency's decision. *Id.*

¶ 41    While findings of fact are reviewed with a "manifest weight of the evidence" standard, when the question presented is a mixed question of law and fact, we review for "clear error." *Pasic v. Department of Financial & Professional Regulation*, 2022 IL App (1st) 220076, ¶ 17. A mixed question of law and fact is one in which the facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the applicable legal standard. *AFM Messenger Service, Inc. v. Dep't of Employment Security*, 198 Ill. 2d 380, 391 (2001). A "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 393.

¶ 42    Finally, we review questions of law *de novo*. *Id.*

¶ 43                              B. Evidence of Disqualifying Conduct

¶ 44    The Police Board was charged with determining whether Navarro-Angulo met his burden to establish, by a preponderance of the evidence, that the decision to disqualify him was erroneous. The parties dispute whether the manifest weight of the evidence or the clear error standard of

review applies. Here, Navarro-Angulo disputes that he engaged in certain criminal and dishonest conduct. Because the Police Board resolved historical factual disputes and assessed credibility to determine whether particular conduct occurred, the manifest weight standard applies, not the clear error standard. See *AFM Messenger Service*, 198 Ill. 2d at 391 (stating the "clearly erroneous" standard applies to mixed questions of law and fact, which are questions in which the facts are admitted or established).

¶ 45     As a preliminary matter, we note that most of Navarro-Angulo's arguments are directed at the judgment of the circuit court. However, in an action for administrative review, we "review the decision of the administrative agency not the circuit court decision." *Lopez v. Dart*, 2018 IL App (1st) 170733, ¶ 67. To the extent Navarro-Angulo challenges the circuit court's judgment, we construe his arguments as challenges to Police Board's decision.

¶ 46     According to the Police Board's decision, Navarro-Angulo was removed from the list of eligible applicants for the position of probationary police officer for three independent bases. The first basis the Police Board cited was conduct indicating dishonesty:

> "**Basis #1**
>
> IV-B. Disqualification Based on Criminal Conduct, as cited by Department:
>
> 7. Other Criminal Conduct
>
> b. Conduct Indicating Dishonesty *** [2] Any conduct demonstrating a reputation or propensity for dishonesty will be grounds for disqualification. Conduct demonstrating a propensity for dishonesty includes but is not limited to conduct that would constitute *** false impersonation ***. [3] As noted above, an applicant who has engaged in any act falling within the scope of this section that constitutes a felony will be found unsuitable for employment. *** 720 ILCS 5/32-5.1 False

14

[Imp]ersonation of a Peace Officer Class 4 Felony." (Formatting in original.)

¶ 47    As a preliminary matter, we note that the Police Board's citation of the statute for false personation of a peace officer is out of date. Although false personation was previously codified at 720 ILCS 5/32-5.1 (Repealed eff. July 1, 2011), it is now codified at 720 ILCS 5/17-2 (West 2022). Nevertheless, it is accurate that false personation of a peace officer is a class 4 felony. 720 ILCS 5/17-2(b)(3); 17-2(f)(5) (West 2022).

¶ 48    The Police Board adopted the appeals officer's findings that, on December 10, 2023, Navarro-Angulo falsely represented himself as a probationary police officer enrolled in the Police Academy. This finding was based on the police report of the alleged domestic incident between Navarro-Angulo and L.C.-T. Additionally, the background investigator conducted a phone interview with one of the reporting officers "who recalled the incident and reported he remembered [Navarro-Angulo] telling the alleged victim he was in the Police Academy."

¶ 49    In his appeal to the Police Board, Navarro-Angulo categorically denied that he falsely impersonated a police officer, and explained that the statements may have been the result of a miscommunication or misunderstanding, rather than a knowing false representation. Although we acknowledge that a miscommunication or misunderstanding is a reasonable alternate explanation, the Police Board did not accept Navarro-Angulo's version of events. Instead, the Police Board gave more weight to the police report and phone interview with one of the reporting officers who recalled Navarro-Angulo making the false representation that he was a member of the Police Academy when he was not. We are not permitted to reweigh the evidence or substitute our judgment for the agency's judgment. *Cintron*, 2022 IL App (1st) 201369, ¶ 19. On this record, we cannot say that "the opposite conclusion is clearly evident" regarding impersonation of a police officer. *Id.*

¶ 50    The second basis the Police Board cited was conduct indicating violent tendencies, including stalking, assault, domestic battery, and criminal damage to property:

"**Basis #2**

IV-B. Disqualification Based on Criminal Conduct, as cited by Department:

7. Other Criminal Conduct

c. Conduct Indicating Violent Tendencies *** [A]ny conduct demonstrating a propensity for violence will be grounds for disqualification. Conduct demonstrating a propensity for violence includes but is not limited to, conduct which would constitute *** assault; battery, aggravated battery; offenses against property; robbery; domestic violence; [and] stalking[.] *** As noted above, an applicant who has engaged in any act falling within the scope of this section that constitutes a felony will be found unsuitable for employment. *** 720 ILCS 5/12-7.3 a-3 Stalking Class 4 Felony."

* * *

720 ILCS 5/12-1 Assault Class C Misdemeanor

* * *

720 ILCS 5/12-3.2 (a)(1) Domestic Battery - Bodily Harm Class A Misdemeanor

720 ILCS 5/21-1 (a)(1) Criminal Damage to Property Class B Misdemeanor

720 ILCS 5/12-1 Assault Class C Misdemeanor." (Formatting in original.)

¶ 51    On this record, there is sufficient evidence of conduct indicating Navarro-Angulo's violent tendencies, including conduct that would constitute stalking, assault, domestic battery, and criminal damage to property. The Police Board relied on a plethora of evidence, including but not limited to: (1) the Morton College Police Department Report from October 3, 2012 describing

16

Navarro-Angulo grabbing S.J. by the arm, and continuing to contact S.J. via telephone despite an officer's instruction that there be "no contact" with S.J.; (2) the January 1, 2024 interview with S.J. in which she describes stalking behavior; (3) the October 2012 petition for order of protection filed by S.J. describing stalking and threatening behavior; (4) the December 10, 2023 police report describing Navarro-Angulo physically attacking L.C.-T. by striking her in the leg and head, leading to a bleeding gash on her upper lip, as well as damaging her cell phone.

¶ 52     Although Navarro-Angulo denied that he engaged in any of the alleged conduct indicating violent tendencies, the Police Board adopted the appeal's officer's findings, which credited investigator Lynch's report and rejected Navarro-Angulo's contrary statements. The Police Board was not convinced by Navarro-Angulo's assertion that all of the reports against him were based on "false allegations." As previously mentioned, we are not permitted to reweigh the evidence or substitute our judgment for the agency's judgment. *Cintron*, 2022 IL App (1st) 201369, ¶ 19. Based on the plethora of evidence from different sources, we determine that the Police Board's determination to disqualify Navarro-Angulo based on conduct indicating violent tendencies is not against the manifest weight of the evidence. *Marconi*, 225 Ill. 2d at 534.

¶ 53     The third basis the Police Board cited was false statements or omissions or failure to cooperate in the application process:

> "**Basis #3**
>
> IV-I. Disqualification Based on False Statements or Omissions and/or Failure to
>
> Cooperate in the Application Process *** Prohibited conduct within this category
>
> includes, but is not limited to: *** failure to fully disclose all known information
>
> requested, whether it is beneficial or prejudicial to the applicant[.]" (Formatting in
>
> original.)

¶ 54　　The Police Board cited two instances of Navarro-Angulo's failure to disclose all known information requested. First, Navarro-Angulo did not initially disclose a relationship with R.M. Navarro-Angulo initially told an investigator that he had not had any romantic relationships after 2012. It was only after further questioning that he stated that he was in a relationship with a woman, R.M., from 2015 to 2016. Second, Navarro-Angulo repeatedly denied knowing L.C.-T. After further questioning, he claimed that he knew her but only met her a couple times and denied any involvement in the December 2023 incident. The Police Board adopted the appeals officer's finding that Navarro-Angulo's statement that he only met L.C.-T. a couple of times was not credible. We will not reweigh the evidence, and we do not find that the opposite conclusion is clearly evident regarding Navarro-Angulo's false statements and omissions. *Cintron*, 2022 IL App (1st) 201369, ¶ 19.

¶ 55　　Accordingly, the Police Board's decision on all three bases was amply supported by the administrative record. After reviewing the entire record, we determine there is sufficient evidence to support the Police Board's findings. *Id.* Therefore, we affirm the Police Board's determination upholding Navarro-Angulo's disqualification.

¶ 56　　　　　　　　　　　　　　C. Due Process Claims

¶ 57　　Additionally, Navarro-Angulo argues that the Police Board violated his right to due process. The question of whether "an administrative proceeding violated an individual's right to due process presents a question of law and, therefore, is subject to *de novo* review." *Wolin v. Department of Financial & Professional Regulation*, 2012 IL App (1st) 112113, ¶ 25.

¶ 58　　In particular, Navarro-Angulo asserts that his due process rights were violated because the appeals officer reviewed only written submissions, without a hearing, testimony, or ability to confront witnesses. The "essential requirements of due process *** are notice and an opportunity

18

to respond." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985). An opportunity to respond is the "opportunity to present reasons, either in person or *in writing*, why proposed action should not be taken." (Emphasis added.) *Id.*

¶ 59    Here, the Chicago Municipal Code outlines the procedures the Police Board is required to carry out in order to satisfy due process for probationary police officers. Applicants who are removed from the eligibility list must receive a written notice stating the reasons for the disqualification decision. Chicago Municipal Code § 2-84-035(b)(1) (added Nov. 26, 2019). The applicant may then, within 60 days, file an administrative appeal with the Police Board consisting of a "written request specifying why [CPD] erred in the factual determinations underlying the disqualification decision, or bringing to the [Police] Board's attention additional facts directly related to the reason(s) for the disqualification decision." *Id.* § (b)(2). In the appeal, the applicant bears "the burden of showing, by a preponderance of the evidence, that [CPD's] decision to remove the applicant from the eligibility list was erroneous." *Id.* § (c). The applicant may bring to the Police Board's attention any additional facts and documentary evidence bearing on the reason for disqualification. *Id.* §§ (b)(2) & (e)(3). CPD may file a written response and, if it does, the applicant may file a written reply. *Id.* § (b)(3). Under the Administrative Review Law, applicants may appeal the Police Board's decision by filing a complaint for administrative review in the circuit court. 735 ILCS 5/3-101 *et. seq* (West 2022).

¶ 60    Here, there is no dispute that Navarro-Angulo received written notice of his disqualification and that he took full advantage of the opportunity to challenge his disqualification through a written appeal to the Police Board. Navarro-Angulo cites no caselaw that supports the proposition that disqualified applicants are entitled to an in-person hearing in which they can confront witnesses. Nor are we aware of any such caselaw.

¶ 61 Further, Navarro-Angulo complained due process was violated because the Police Board adopted the appeals officer's recommendation "without independent analysis." However, the Chicago Municipal Code explicitly allows the Police Board to appoint a hearing officer to make "recommendations," *id.* § (d), and the Police Board renders the final "decision on the appeal," *id.* § (b)(4). It was not a violation of due process for the Police Board to review and adopt the recommendations of the appeals officer consistent with the Chicago Municipal Code.

¶ 62                                     III. CONCLUSION

¶ 63 For these reasons, we affirm the decision of the Police Board and consequently that of the circuit court. The Board's determination that Navarro-Angulo was disqualified from eligibility as a probationary police officer was not against the manifest weight of the evidence. Navarro-Angulo did not meet his burden to show that his removal from the eligibility list was erroneous. The Board's procedures complied with due process.

¶ 64 Police Board affirmed.

¶ 65 Circuit Court affirmed.